

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00373-CV

———————————————

IN THE INTEREST OF A.H. AND B.H., CHILDREN

---

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 24-0897-158

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

After a jury trial, the trial court terminated Mother's parental rights to her daughters Ann and Betty.[1]  The jury found that the Texas Department of Family and Protective Services (the Department) had proven that termination was in the children's best interest, *see* Tex. Fam. Code Ann. § 161.002(b)(2), and that Mother had engaged in conduct specified in Subsections (D), (E), (N), and (O) of Section 161.001(b)(1) of the Texas Family Code, *id.* § 161.002(b)(1)(D), (E), (N), (O).[2]

On appeal, Mother raises three issues: (1) the termination proceedings violated her due-process rights because she did not understand them; (2) legally and factually insufficient evidence supports the grounds found by the jury; and (3) trial counsel rendered ineffective assistance.

We hold that Mother failed to preserve her due-process complaint, that the evidence is legally and factually sufficient to support the jury's finding on the Subsection (E) ground (that Mother had engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered their physical or emotional well-being), and that Mother has not shown that her trial counsel rendered

[1]To protect the children's identities, we use aliases when referring to them and refer to their family members by their relationship to the children.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]For purposes of this opinion, we focus only on the Subsection (E) ground— the finding that Mother had engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered their physical or emotional well-being.  *See id.* § 161.001(b)(1)(E).

ineffective assistance. Because we have found the evidence legally and factually sufficient under the Subsection (E) ground and because only one ground is necessary to support a termination, we need not determine whether sufficient evidence supports the jury's findings under Subsections (D), (N), and (O). *In re J.F.G., III*, 500 S.W.3d 554, 559 (Tex. App.—Texarkana 2016, no pet.). Accordingly, we overrule Mother's three issues and affirm the trial court's judgment.

## I. Background

This case started on January 29, 2024, when a neighbor found two-year-old Betty in the street unattended. The neighbor went to Mother's house and knocked on the door, which came open. The neighbor shouted for someone, but no one answered, so she called the police.

Shortly after the police arrived, Mother walked up to a number of people standing across the street from her home; the neighbor, who was holding Betty, was among this group. When the police determined that Mother was Betty's parent, Mother left the group and walked into her house, leaving Betty with the neighbor. While walking to her house, Mother told the responding officer that she had a CPS[3] case that had been going on for ten years.

Once inside the house, the officer heard a noise upstairs and asked Mother to identify who else was with them in the house. Mother said it was her six-year-old

_____

[3]CPS refers to Child Protective Services.

daughter, Ann. The officer asked Mother if she wanted to check on Ann, but Mother declined.

Regarding why Mother had left her children alone, Mother said that she had left to get diapers. She returned to her house, however, without diapers.[4] While one officer talked to Mother, a second officer went upstairs and found about a dozen diapers on the floor.

While talking with the officer, Mother stated that in addition to Ann and Betty, she had three other children, and her CPS case involved these other three children. Mother told the officer that she would resist anyone who tried to take Ann and Betty. Mother also asserted that she had thought about killing herself.

Concerned about Mother's behavior, the officers, among themselves, questioned whether she was on methamphetamines or possibly bipolar. One officer stated that he had looked for tracks on Mother's arms but did not see any. The officers wanted a medic to look at Mother and expressed concerns about a "med clearance." The medic, after seeing Mother, did not express any concerns. Although

_____

[4]One officer at the scene speculated that Mother had left the house to go "hooking." One of Mother's statements to the officers provided some basis for this speculation. At one point, Mother lamented that she had "banged this n****r for $15 for a f***ing box of diapers."

4

not entirely clear, the officers appear to have tested something and to have concluded that whatever it was that they tested was not the issue.[5]

In addition to Mother's behavior, the police were concerned about a number of hazards within the home. For example, knives were left on the kitchen counter within reach of the children, a bathtub was left half-filled with water, and a nugget of marijuana was in a master closet within reach of the children. The officers arrested Mother for abandoning and endangering a child with intent to return. Although the officers took measures to screen the children from witnessing Mother's arrest, the children could hear Mother's screams, and Ann became concerned: "Mom's gonna be in danger. I want my mom. She needs me. Those police are bad." The officers called CPS and kept Mother in a patrol car until a CPS investigator arrived at the scene.

After the removal—from January 29, 2024, until trial in July 2025—Mother had seventy-four opportunities to visit Ann and Betty. She visited them twice in person and three times virtually. And despite being ordered from the outset to get a psychological evaluation as part of her services, and despite acknowledging that she could have done the evaluation virtually, Mother never got one.

---

[5]When testifying, Mother denied using methamphetamines: "For the record, I have never used meth." Mother tested positive for marijuana in April 2024. Mother completed a drug and alcohol assessment on August 30, 2024, but did not follow the recommendations. After August 30, 2024, Mother did not take any drug tests. Mother refused to submit to drug tests fifteen times.

We will further develop the record as necessary to address Mother's sufficiency complaints.

## II. Evidentiary Sufficiency

We address Mother's legal and factual sufficiency challenges first. "Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief." *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). Legal sufficiency challenges generally afford the appellant the greatest relief. *In re Commitment of Jones*, 650 S.W.3d 692, 698 (Tex. App.—Fort Worth 2022, pet. denied) (op. on en banc reconsideration).

### A. One Ground Sufficient

In Mother's second issue, she contends that the evidence is legally and factually insufficient to support the predicate-ground findings under Subsections (D), (E), (N), and (O).[6] Only one ground is needed to uphold a termination judgment on appeal. *In re L.T.*, No. 02-22-00197-CV, 2022 WL 15053329, at *4 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op.). If parental rights are terminated under Subsection (D) or (E)—grounds that may have prejudicial collateral consequences for a parent, *see In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019)—we must address either Subsection

---

[6]Mother filed a motion for new trial. Although not a model of clarity, for purposes of this opinion, we will assume, without deciding, that it attacked both the legal and factual sufficiency of the evidence on each ground and on best interest. *See* Tex. R. Civ. P. 324(b). On appeal, Mother does not attack the best-interest finding.

(D) or (E) regardless of the merits of any other grounds. *L.T.*, 2022 WL 15053329, at *4 n.11.

**B. Legal and Factual Sufficiency Standards of Review**

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Section 161.001(b)(1) of the Texas Family Code and (2) that termination is in the child's best interest under Section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it produces "in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

When reviewing the sufficiency of the evidence, we ask whether a reasonable factfinder could have formed a firm belief or conviction that the contested finding was true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020); *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Both legal and factual sufficiency turn on this question; the distinction between the two lies in the extent to which disputed evidence contrary to the finding may be considered in answering the question. *A.C.*, 560 S.W.3d at 630.

In our legal sufficiency analysis, we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and disregard all evidence

7

that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *A.C.*, 560 S.W.3d at 630–31. In comparison, factual sufficiency "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *A.C.*, 560 S.W.3d at 631. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review.").

The legal and factual sufficiency determinations overlap. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.); *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.). Therefore, we will conduct a consolidated review. *See In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *1–2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.); *A.O.*, 2022 WL 1257384, at *8.

### C. Endangerment Under Subsection (E)

Subsection (E) permits termination when the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered a child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E).

"Endanger" means to jeopardize or to expose to loss or injury. *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.). The relevant inquiry under Subsection (E) is whether evidence shows that a child's endangerment was the direct result of the parent's conduct, which encompasses acts, omissions, or failures to act. *Id.* The conduct, however, need not be directed at the child or cause the child actual injury. *Id.* Courts may consider a parent's conduct that occurred outside the child's presence or after the Department removed the child. *In re R.H.*, 693 S.W.3d 846, 856 (Tex. App.—Fort Worth 2024, pet. denied); *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.). Additionally, termination under Subsection (E) must be based on more than a single act; Subsection (E) requires a voluntary, deliberate, and conscious course of conduct by the parent. *R.H.*, 693 S.W.3d at 856; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

### D. Application

#### 1. Mother Endangered Ann, Betty, and Another Small Child

Mother admitted pleading guilty to two counts of abandoning or endangering a child based on the events that led to the children's removal.[7] *See* Tex. Penal Code

---

[7]A police officer testified that Mother was arrested for abandoning and endangering a child with the intent to return. Abandoning a child with the intent to return is a state-jail felony, and abandoning a child without the intent to return is a

Ann. § 22.041(b). By pleading guilty, Mother admitted that "while [having] custody, care, or control of [Ann and Betty], hereafter styled the complainant[s], [children] younger than 15 years, [she] intentionally abandon[ed] the complainant[s] in a place under circumstances that exposed the complainant[s] to an unreasonable risk of harm, namely without adequate supervision in a home in which the child[ren] had access to marihuana, knives, a bathtub containing water[,] or the nearby street." Mother thus admitted to endangering Ann and Betty.

And this was not the first time that one of Mother's small children had been found outside and unattended. As noted, Mother had three other children that CPS had removed. They were removed in 2014 when Mother's then two-year-old child was found wandering alone and unsupervised outside of Mother's motel room.[8]

### 2. Mother and the Specter of an Untreated Mental Illness or Disorder

From the outset, questions about Mother's mental health presented themselves. For the approximately seventeen months that her case was pending, she avoided getting a psychological evaluation. Consequently, there was no evidence from a psychologist stating whether Mother had a mental illness or disorder, identifying what

---

third-degree felony. *See* Tex. Penal Code Ann. § 22.041(d)(1)–(2). Mother received deferred adjudication community supervision for both offenses.

[8]Although Mother's parental rights to these three children were not terminated, two of the children were still in the care of a legal guardian, and the third had aged out of the system and was living with Mother's mother. According to the legal guardian, Mother had done nothing to gain access to the two children in her care.

10

the mental illness or disorder was (if she had one), and how best to address her mental illness or disorder (again, assuming she had one).[9] Nevertheless, based on the evidence presented at trial, a rational factfinder could have reasonably inferred that she had a mental illness or disorder of some sort and that she actively avoided treatment.

For example, during the removal, based on Mother's behavior, officers thought she was either under the influence of a narcotic or bipolar. Their inquiries tended to refute that illegal drugs explained Mother's behavior. An officer observed no tracks on her arms. Concerned that Mother might have been on drugs, the officers had a medic look at her, but the medic, after evaluating her, expressed no concern. And the officers appeared to have tested a substance found in the house, but it did not provide any additional information.

At the removal scene, Mother's behavior was atypical. For example, after the police arrived, Mother stood across the street from her house with a group of people, one of whom was the neighbor who was holding Betty. Mother did not take Betty from the neighbor. When someone identified Mother as Betty's parent, Mother walked across the street and into her house. But she left Betty in the neighbor's arms. And once in her house, Mother neglected to tell the officer that anyone else was in the house with them, so when the officer heard someone upstairs, he became concerned

---

[9]In her appellate brief, Mother arguably concedes that she has a mental illness or disorder. Mother's first and third issues are premised on Mother's having a mental illness or disorder of some sort.

and asked Mother who that was. Mother told the officer that the person was her six-year-old daughter, Ann. But when the officer asked Mother if she wanted to check on Ann, Mother declined. Thereafter, for long stretches, Mother talked nonstop, and at several points, she lost her emotional control. The officers were concerned enough about her behavior to ask a medic to check her out.

After the removal, Mother told her caseworker that she had previously been misdiagnosed with bipolar disorder and schizophrenia. The jury, as the factfinder, could have believed the part about Mother having been previously diagnosed with bipolar disorder and schizophrenia and disbelieved the part about those being misdiagnoses. *See In re Z.D.*, No. 02-25-00114-CV, 2025 WL 2177389, at *3 (Tex. App.—Fort Worth July 31, 2025, pet. denied) (mem. op.) (stating that the factfinder can believe all, some, or none of a witness's testimony). Mother's caseworker testified that Mother's mental health was a major concern because "[t]here had been previous reports and previous history that stated that there was a mental health diagnosis" and because Mother "was not receiving any mental health services."

As part of Mother's services, Mother was ordered to get a psychological evaluation. Despite acknowledging that she could have done the evaluation virtually, Mother never got one. Although Mother gave explanations regarding why she was not able to complete a psychological evaluation from January 2024 until July 2025, a rational juror could have nevertheless reasonably inferred that Mother deliberately

12

avoided a psychological evaluation for fear of being "misdiagnosed"—perhaps with bipolar disorder and schizophrenia—a second time. *See id.*

Mother's conduct during the case reinforced the Department's concerns that Mother might have mental health issues. For example, after visits with her children, she would say a prayer that they be protected from zombies, witches, and demons and would then sprinkle holy water on them. In addition, Mother told the Court Appointed Special Advocate that she was a descendant of King Solomon and the Queen of Sheba and that, as their descendant, she had special gifts and powers. Further, in October 2024, the trial judge in open court ordered Mother to get a drug test after the hearing, but she refused. Mother testified that she refused to give a hair sample "for religious purposes" and that she refused to take a nail test because she "didn't agree with it."

In short, a rational factfinder could have reasonably inferred that Mother had a mental health issue or disorder of some sort and that Mother avoided having a psychological evaluation in an attempt to conceal it. In the process, Mother avoided treatment for her mental illness or disorder—whatever it was. Untreated mental illness can expose a child to endangerment. *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re L.M.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *14 (Tex. App.—Fort Worth May 29, 2014, no pet.) (per curiam) (mem. op.). Thus, a rational factfinder could have inferred that Mother's

refusal to receive treatment endangered the children. *See S.R.*, 452 S.W.3d at 363; *L.M.F.*, 2014 WL 2465137, at *14.

Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *M.B.*, 2015 WL 4380868, at *12. Regardless of the reasons for Mother's acts or omissions, they exist and must be considered when determining termination grounds and best interest. *See In re D.W.*, 353 S.W.3d 188, 197 (Tex. App.—Texarkana 2011, pet. denied). Here, a reasonable factfinder could have concluded that Mother's conduct had subjected—and would continue to subject—the children to uncertainty and instability.

### 3. Ruling

Whether we view the record in a light most favorable to the Subsection (E) finding or weigh the disputed evidence for and against the finding, a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in a course of conduct that had endangered Ann's and Betty's physical or emotional well-being. *See A.N.*, 2022 WL 2071966, at *6. Because sufficient evidence supports the jury's predicate-ground finding under Subsection (E), we need not address Subsections (D), (N), or (O). *See J.F.G., III*, 500 S.W.3d at 559. We overrule Mother's second issue.

### III. Due Process

In Mother's first issue, she contends that she was denied due process because she had mental health issues that prevented her from understanding the proceedings

and because she was not appointed a guardian ad litem. At trial, however, Mother never requested the appointment of a guardian ad litem, and the trial court—necessarily—never denied her request. To preserve a due-process complaint, a party must raise it and obtain a ruling in the trial court. *See In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003); *In re J.P.-L.*, 592 S.W.3d 559, 575 (Tex. App.—Fort Worth 2019, pet. denied). Because Mother did neither, she has not preserved her first issue. Accordingly, we overrule it.

## IV. Ineffective Assistance of Counsel

Mother's third issue is related to her first issue. Mother contends that her trial counsel was ineffective because she did not attempt to have a guardian ad litem appointed for Mother. We disagree.

In this instance, preservation is not a concern. A parent may raise an ineffective-assistance complaint for the first time on appeal. *In re T.J.*, No. 05-22-00594-CV, 2023 WL 1988838, at *13 (Tex. App.—Dallas Feb. 14, 2023, no pet.) (mem. op.).

### A. Mother's Burden

To prove ineffective assistance, a parent must show both (1) that trial counsel's performance was deficient and (2) that trial counsel's deficient performance prejudiced her case. *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)); *J.P.-L.*, 592 S.W.3d at 576. Mother can do neither.

## B. Performance Not Deficient

Trial counsel's performance was not deficient. The Texas Family Code makes no provision for appointing a guardian ad litem to a parent. *J.P.-L.*, 592 S.W.3d at 581. And to the extent that Mother asserts that the Texas Disciplinary Rules of Professional Conduct impose such a duty independently of the Texas Family Code, the Texas Supreme Court has already addressed and rejected that argument. *See In re Thetford*, 574 S.W.3d 362, 372 (Tex. 2019) (orig. proceeding); *J.P.-L.*, 592 S.W.3d at 583–84.

Nothing in the record suggests that Mother was legally incompetent in the criminal sense; that is, nothing suggested that she was not able to consult with her lawyer with a reasonable degree of rational understanding or that she did not have a rational as well as factual understanding of the proceedings against her. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a) ("Incompetency; Presumptions"); *J.P.-L.*, 592 S.W.3d at 582. Just the contrary, Mother's testimony showed that she understood the consequences of the proceedings all too well. She asked the jury not to terminate her parental rights, stated that she loved her children, and explained that she was human and made mistakes.

And to the extent that Mother argues that she lacked "capacity" in the civil sense, that is, she lacked the ability to understand the nature and consequences of her actions, *see, e.g.*, Tex. Health & Safety Code Ann. § 574.101(1); *J.P.-L.*, 592 S.W.3d at 582, the record does not show that either. For example, Mother admitted pleading

16

guilty to two counts of abandoning or endangering a child. *See* Tex. Penal Code Ann. § 22.041(b). When asked why she had pleaded guilty, she responded, "Because I accepted responsibility for my actions."

Consequently, Mother has not shown that trial counsel's performance was deficient because she did not seek the appointment of a guardian ad litem.

### C. No Harm

Mother has not shown harm. In a termination proceeding, the primary consideration is the child's best interest. *See* Tex. Fam. Code Ann. § 153.002; *J.P.-L.*, 592 S.W.3d at 588. How a guardian ad litem might have changed the outcome is not clear. *See J.P.-L.*, 592 S.W.3d at 588.

### D. Ruling

We overrule Mother's third issue.

## V. Conclusion

Having overruled Mother's three issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: December 11, 2025